

COPY FOR YOUR INFORMATION

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

RECEIVED
In Chambers of:
U.S. District Judge
SANDRA L. TOWNES
OCT - 6 2008

August 20, 2008

**TO BE FILED UNDER SEAL**

Hon. Sandra L. Townes
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

Re: Motion Pursuant to 18 U.S.C. § 3292 to Suspend The Running of the Statute of Limitations While The United States Obtains Foreign Evidence

Dear Judge Townes:

Please accept this letter in lieu of a formal motion and memorandum in support of the Government's motion to suspend the running of the statute of limitations pursuant to 18 U.S.C. § 3292 while the United States obtains evidence of offenses in Canada. Please find enclosed a proposed order suspending the statute of limitations from July 24, 2008, which is the date of the Government's official request to Canada for the evidence, to the time Canada takes final action on the request.

**Section 3292**

Section 3292 provides that upon motion of the Government indicating that evidence of an offense is in a foreign country, the District Court shall suspend the running of the statute of limitations for the offense if: 1) it finds by a preponderance of the evidence that an official request has been made for such evidence; and 2) that it reasonably appears that such evidence is, or was, in the foreign country. The statute provides that the suspension not exceed three years and shall not extend the period within which a criminal case must be initiated for more than six months if the foreign authority takes final action before such period would expire without regard to Section 3292.

**The Witnet Market Manipulation Scheme**

A grand jury in this District is investigating a fraud scheme in which individuals based in Canada, including Cosimo Commisso, Lloyd Robinson, David Amar, Eddie Mello, Julius Csurgo, Rhonda Sullivan, and Sean O'Keefe (collectively, the "Canadian Co-Conspirators") and individuals in the United States, including Mark Sporn and Irving Freiberg (collectively, the "American Co-Conspirators"), defrauded the investing public in connection with the common stock of Witnet International, Inc. ("Witnet"). The fraud was a classic market manipulation known as a pump and dump. In order to generate interest in the stock, the Canadian Co-Conspirators and the American Co-Conspirators disseminated information to the public that contained misstatements about the viability and future prospects of Witnet. The Canadian Co-Conspirators and the American Co-Conspirators then sold shares of the stock at a significant profit.

Witnet was a Toronto-based software development company. In June 2002, Witnet became a publicly-traded company through a reverse merger with New Cinema Partners, a shell company with virtually no ongoing business operations at the time of the merger. Thereafter, its shares were traded through the Over-the-Counter Bulletin Board market.[1]

Between 1999 and 2003, Witnet and its predecessor companies issued over 100 million shares of common stock through mergers, private placements and as compensation for services.[2] The SEC filings for Witnet and its predecessor companies during this period indicate that the company was little more than a shell with virtually no assets or operations. For example, for the year prior to February 29, 2000, general and administrative costs were approximately $1,418,134 while current assets totaled just $99 in cash. During the same time frame, net sales were $0, the cost of goods sold was $0, and the gross profit on sales was $0.[3]

---

[1] According to Witnet's form 10KSB, as filed with the SEC on April 18, 2003.

[2] According to records provided by Executive Registrar & Transfer Agency, Incorporated ("Executive Registrar"), Witnet's certificate transfer agent.

[3] According to Witnet's form 10SB12G/A, as filed with the SEC on October 13, 2000.

On May 14, 2003, Investor Insights, a financial newsletter disseminated via e-mail, predicted that Witnet could generate revenue of $8 million for 2003 and $28 million for 2004. The newsletter also contained a "near term target price" of $.23 per share. Witnet was trading at between $.05 and $.08 per share at the time. On May 15, 2003, a nearly identical financial newsletter was distributed via e-mail by Bullseye Stock Profiles. A cooperating witness (the "CW") has advised the Government that these newsletters were published by Irving Freiberg, a U.S. based stock promoter who had been recruited by the Canadian Co-Conspirators to tout Witnet stock. The CW, who has first-hand knowledge of the scheme, has provided reliable information to the Government regarding the Witnet fraud as well as about other crimes involving the manipulation of securities.

Similarly, on May 15, 2003, a press release issued by Witnet contained identical claims of projected revenue for 2003 and 2004. Witnet claimed even larger potential revenues in a May 20, 2003, press release that stated, "[t]he Company estimates revenues of up to $5,000,000 per month if they capture just half of one percent of the potential market [of cellular telephone users]."

On May 23, 2003, Witnet disclosed in corporate documents filed with the SEC that Witnet was only a development stage company that "has experienced recurring losses since inception and has negative cash flows from operations that raise substantial doubt as to its ability to continue as a going concern."[4] For the three months ending March 31, 2003, Witnet had just $72 in cash, total assets of $235,191, revenues of $98,879, and a net loss of $33,451.[5] Thus, the claims in the newsletters and in Witnet's press release provide false and misleading information about the company's future financial condition.

On May 14, 2003, prior to the release of the newsletters and press releases, the trading volume of Witnet stock totaled less than 6,000 shares. On May 15, 2003, after the release of the Investor Insights newsletter and the Witnet press release, total trading volume of Witnet stock increased to over 5 million shares. On May 16, 2003, after the release of the

[4] According to Witnet's form 10-QSB, as filed with the SEC on May 23, 2003.

[5] According to Witnet's form 10-QSB, as filed with the SEC on May 23, 2003.

Bullseye Stock Profiles newsletter, total trading volume increased to over 14 million shares.[6] These numbers indicate that Witnet's trading volume increased approximately 280,000% from May 14, 2003, to May 16, 2003. During the same time period, Witnet traded from a low bid price of $.04 per share to a high offer price of $.08 per share. The increased demand for Witnet shares was met with a nearly equal amount of willing sellers, which suggests that the newsletters and press releases arranged by the Canadian Co-Conspirators were effective in creating a demand for the stock.[7]

Freiberg and his associate, Marc Sporn, sold a combined total of 6.2 million shares of Witnet on May 15 and May 16, 2003. The shares were sold through personal accounts at U.S. brokerage firms and a corporate account in the name of Eastern Consulting Corporation.[8] Freiberg and Sporn had originally received their shares from Julius Csurgo, the person to whom the shares were originally issued.[9] Csurgo was, in fact, simply a conduit through which the Canadian Co-Conspirators issued shares of the stock. This is apparent because the majority of Csurgo's shares of Witnet stock, which were issued to him on April 14 and 25, 2003, were re-registered to Sporn and Freiberg within weeks of the issuances to Csurgo.[10]

During May 2003, a large quantity of Witnet shares was also sold through Canadian brokerage firms, including Desjardins Securities, Incorporated ("Desjardins Securities") and Research Capital Corporation ("Research Capital"). Desjardins Securities sold a total of 610,000 shares and did not purchase a single share. Research Capital traded a total of 1,510,000 shares; of these shares, 1,205,000 were sold. Virtually all of the trades conducted by Research Capital were made as agency trades, which

---

[6] According to records provided by the Criminal Prosecution Assistance Group ("CPAG") of the Financial Industry Regulatory Authority.

[7] According to records provided by CPAG.

[8] According to records provided by Wachovia Securities, LLC., and Southwest Securities, Incorporated.

[9] According to records provided by Executive Registrar.

[10] According to records provided by Executive Registrar.

indicates that they were done on behalf of retail accounts.[11] These accounts were under the control of the Canadian Co-Conspirators.[12] For example, certain shares issued to Commisso were later deposited into accounts at Research Capital and Desjardins,[13] then were re-registered in the names of the brokerage firm or the Depository Trust Company.[14] Stephen Taub, a registered representative at Research Capital has advised that he opened accounts for Commisso, Amar, Melo, Sullivan, O'Keefe and others in order to facilitate the sale of Witnet shares.

A month or two after this fraudulent promotion of Witnet, Sporn and Freiberg agreed to do a second fraudulent promotion by e-mail in exchange for additional shares of Witnet. During this second promotion, the same type of trading occurred, involving large blocks of Witnet stock. Brokerage and other records show that Freiberg, Sporn and Eastern Consulting received large blocks of Witnet shares on July 29, July 31 and August 1, 2003 respectively. Freiberg and Sporn sold those shares at least through the month of September 2003.

**The July 24, 2008 Official Request to Canada**

On July 24, 2008, the United States submitted a request for assistance of the appropriate authorities in Canada pursuant to the Treaty on Mutual Assistance in Criminal Matters. In this request, the United States sought: 1) brokerage records from Desjardins Securities, Research Capital and other Canadian brokerage firms that showed trading in Witnet during the relevant time period; and 2) criminal history and immigration records for relevant actors in the Witnet market manipulation scheme. To date, the government of Canada has not taken any formal action on this request.

**Conclusion**

Pursuant to Section 3292, the Government respectfully requests an order suspending the running of the statute of limitations for the crimes for which the government is seeking evidence in Canada, specifically securities fraud; mail fraud;

---

[11] According to records provided by CPAG.

[12] According to records provided by Executive Registrar.

[13] According to records provided by Executive Registrar.

[14] According to records provided by Executive Registrar.

wire fraud; money laundering; and engaging in financial transactions with the proceeds of specified unlawful activities. The Government respectfully requests that the running of the statute of limitations on these offenses be suspended from July 24, 2008, which is the date of the Government's official request to Canada, until the date that Canada takes formal action on the request. The Government further respectfully requests that this letter and the accompanying order, if entered by the Court, be filed under seal, as disclosure of this letter or the order could reveal matters occurring before the grand jury.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney

By: JAMES MCMAHON
Assistant U.S. Attorney
(718) 254-6240

Enclosure

RECEIVED
In Chambers of
U.S. District Judge
SANDRA L. TOWNES
OCT - 9 2008



**U.S. Department of Justice**

Criminal Division

*Washington, D.C. 20530*

TO: The Central Authority of Canada

SUBJECT: Request for Assistance in the Investigation of Witnet International, Incorporated

MISC 08 505

DATE: July 23, 2008

The Central Authority of the United States of America requests the assistance of the appropriate authorities in Canada pursuant to the Treaty Between the Government of the United States of America and the Government of Canada on Mutual Legal Assistance in Criminal Matters ("the Treaty"). The United States Attorney for the Eastern District of New York ("the prosecutor") is conducting an investigation into an alleged "pump and dump" scheme of the common stock of Witnet International, Incorporated ("Witnet"). The prosecutor seeks business records from Canadian brokerage firms to trace the Witnet shares as well as to document the source, use, and disposition of the fraud proceeds.

## THE FACTS

### OVERVIEW OF THE FRAUD

Between 1999 and 2003, individuals based in Canada, including Cosimo Commisso, Lloyd Robinson, David Amar, Eddie Mello, Julius Csurgo, Rhonda Sullivan, and Sean O'Keefe (collectively, the "Canadian Co-Conspirators") and individuals in the United States, including Mark Sporn and Irving Freiberg (collectively, the "American Co-Conspirators"), engaged in a fraudulent scheme to defraud the investing public in connection with the purchase and sale of the common stock of Witnet. The fraud was a classic market manipulation often referred to as a "pump and dump." In order to generate interest in the stock, the Canadian Co-Conspirators and the American Co-Conspirators disseminated information to the public that contained misstatements about the viability and future prospects of the company. The Canadian Co-Conspirators and the American Co-Conspirators then sold shares of the stock at great personal profit to themselves.

**CORPORATE HISTORY**

Witnet was a Toronto-based company that was formerly known as New Cinema Partners and Valence 9 Development, Incorporated, ("Valence 9").[1] In August 1999, Valence 9 changed its name to New Cinema Partners and reverse-merged with a private Canadian corporation called New Cinema Partners Incorporated. (A reverse merger is the merger of a private company with a public shell company, which effectively makes the private company a public one without having to make any public disclosures.) The business of New Cinema Partners was supposedly to design, develop, and operate high tech specialized theater venues, including digital interactive movies and IMAX films.[2] In June 2002, Witnet became a publicly-traded company through a reverse merger with New Cinema Partners, a shell company with virtually no ongoing business operations at the time of the merger.

Witnet is purportedly a software development company whose main product is the Mobilick system, which allows control over internet-connected PCs through PDAs (Personal Digital Assistants) that are connected to the wireless internet.[3] Witnet's shares are traded through the Over-The-Counter Bulletin Board (the "OTCBB") market.[4]

Between 1999 and 2003, Witnet and its predecessor companies issued over 100 million shares of common stock through mergers, private placements, and as compensation for services allegedly performed on behalf of the company.[5] However, Witnet and it's predecessor companies' SEC filings during this same time period indicate that it was little more than a shell with virtually no assets or operations. For example, for the year prior to February 29, 2000, general and administrative costs were approximately $1,418,134 while current assets totaled just $99 in cash. During the same time frame, net sales were $0, the cost of goods sold was $0, and the gross profit on sales was $0.[6]

**THE WITNET MANIPULATION SCHEME**

---

[1] According to Witnet's form 10KSB, as filed with the Securities and Exchange Commission ("SEC") on April 18, 2003.

[2] According to Witnet's form 10SB12G, as filed with the SEC on August 11, 2000.

[3] According to Witnet's form 10KSB, as filed with the SEC on April 18, 2003.

[4] According to Witnet's form 10KSB, as filed with the SEC on April 18, 2003.

[5] According to records provided by Executive Registrar & Transfer Agency, Incorporated ("Executive Registrar"), Witnet's certificate transfer agent.

[6] According to Witnet's form 10SB12G/A, as filed with the SEC on October 13, 2000.

On May 14, 2003, Witnet was the subject of a financial newsletter disseminated via e-mail by Investor Insights. On May 15, 2003, a nearly identical financial newsletter was distributed via e-mail by Bullseye Stock Profiles. A cooperating witness (the "CW") has advised the government that these newsletters were published by Irving Freiberg, a U.S. based stock promoter who had been recruited by the Canadian Co-Conspirators to tout Witnet stock. The CW, who was one of the co-conspirators and thus has first-hand knowledge of the scheme, has provided reliable information to the government regarding the Witnet fraud as well as about other crimes involving the manipulation of securities. The newsletters predicted that Witnet could generate revenue of $8 million for 2003 and $28 million for 2004. The newsletters contained a "near term target price" of $.23 per share. Witnet was trading at between $.05 and $.08 per share at the time.

Similarly, on May 15, 2003, a press release issued by Witnet contained identical claims of projected revenue for 2003 and 2004. Witnet claimed even larger potential revenues in a May 20, 2003, press release that stated, "The Company estimates revenues of up to $5,000,000 per month if they capture just half of one percent of the potential market [of cellular telephone users]."

On May 23, 2003, Witnet disclosed in corporate documents filed with the SEC that Witnet was only a development stage company that "has experienced recurring losses since inception and has negative cash flows from operations that raise substantial doubt as to its ability to continue as a going concern."[7] For the three months ending March 31, 2003, Witnet had just $72 in cash, total assets of $235,191, revenues of $98,879, and a net loss of $33,451.[8] Thus, the claims in the newsletters and in Witnet's press release provide false and misleading information about the company's future financial condition.

On May 14, 2003, prior to the release of the newsletters and press releases, the trading volume of Witnet stock totaled less than 6,000 shares. On May 15, 2003, after the release of the Investor Insights newsletter and the Witnet press release, total trading volume of Witnet stock increased to over 5 million shares. On May 16, 2003, after the release of the Bullseye Stock Profiles newsletter, total trading volume increased to over 14 million shares.[9] These numbers indicate that Witnet's trading volume increased approximately 280,000% from May 14, 2003, to May 16, 2003. During the same time frame, Witnet traded from a low bid price of $.04 per share to a high offer price of $.08 per share. The increased demand for Witnet shares was met with a nearly equal amount of willing sellers, which suggests that the newsletters and press releases

---

[7] According to Witnet's form 10-QSB, as filed with the SEC on May 23, 2003.

[8] According to Witnet's form 10-QSB, as filed with the SEC on May 23, 2003.

[9] According to records provided by the National Association of Securities Dealers ("NASD") Department of Enforcement, Criminal Prosecution Assistance Group ("CPAG").

arranged by the Canadian Co-Conspirators were effective in creating a demand for the stock.[10]

Freiberg and his associate, Marc Sporn, sold a combined total of 6.2 million shares of Witnet on May 15 and May 16, 2003. The shares were sold through personal accounts at U.S. brokerage firms and a corporate account in the name of Eastern Consulting Corporation.[11] Freiberg and Sporn had originally received their shares from Julius Csurgo, the person to whom the shares were originally issued.[12] Csurgo was, in fact, simply a conduit through which the Canadian Co-Conspirators issued shares of the stock. This is apparent because the majority of Csurgo's shares of Witnet stock, which were issued to him on April 14 and 25, 2003, were re-registered to Sporn and Freiberg within weeks of the issuances to Csurgo.[13]

During May 2003, a large quantity of Witnet shares was also sold through Canadian brokerage firms, including (1) Desjardins Securities, Incorporated ("Desjardins Securities"), 145 King Street West, Suite 2750, Toronto, Ontario M5H 1J8, or 2 Complexe Desjardins, East Tower, Basilaire 1, Office #311, Montreal, Quebec, H5B 1J2, and (2) Research Capital Corporation ("Research Capital"), Ernst & Young Tower TD Centre, 222 Bay Street, Suite 1500, Toronto, Ontario M5K 1J5. Desjardins Securities sold a total of 610,000 shares and did not purchase a single share. Research Capital traded a total of 1,510,000 shares; of these shares, 1,205,000 were sold. Virtually all of the trades conducted by Research Capital were made as agency trades indicating that they were done on behalf of retail accounts.[14] These accounts were under the control of the Canadian Co-Conspirators.[15] For example, certain shares issued to Commisso were later deposited into accounts at Research Capital and Desjardins,[16] then were re-registered in the names of the brokerage firm or the Depository Trust Company.[17] In April 2006, Stephen Taub, a registered representative at Research Capital, advised that he opened accounts for Commisso, Amar, Melo, Sullivan, O'Keefe, and others in order to facilitate the sale of Witnet shares.

---

[10] According to records provided by CPAG.

[11] According to records provided by Wachovia Securities, LLC., and Southwest Securities, Incorporated.

[12] According to records provided by Executive Registrar.

[13] According to records provided by Executive Registrar.

[14] According to records provided by CPAG.

[15] According to records provided by Executive Registrar.

[16] According to records provided by Executive Registrar.

[17] According to records provided by Executive Registrar.

ALLEGED INVOLVEMENT OF ORGANIZED CRIME

On August 31, 1999, 240,000 shares of Witnet[18] common stock were issued to Rhonda Sullivan, allegedly as part of the reverse takeover involving New Cinema Partners and New Cinema Partners Incorporated.[19] Several articles published by Canadian news services have identified Sullivan as the widow of Eddie Melo, a reputed mob enforcer who was apparently murdered by a hired assassin in April 2001. This issuance is an example of the co-conspirators' use of nominees who are used as a means through which the Canadian Co-conspirators received their shares of stock. Sullivan was a nominee who was allegedly entitled to receive shares of stock because she was a shareholder of the company that was acquired during the reverse merger.

The issuance of the stock shares to Sullivan contradicts information provided by the company in public filings. For example, the company advises that the "sole shareholder" of the Canadian corporation New Cinema Partners Incorporated was to receive 4 million newly issued shares.[20] The filing also advised that as a result of the share exchange transaction, the "former shareholder" of New Cinema Partners Incorporated acquired control over a majority of the shares of New Cinema Partners and therefore control over the corporation. Despite the information provided to the public, the shares were not distributed to a single shareholder but were instead issued to 21 different shareholders, including Sullivan.[21] Sullivan subsequently transferred her shares into a numbered Canadian corporation called 1345519 Ontario Corporation, and eventually deposited the shares into an account at Research Capital.[22]

Cosimo Commisso is also the President and Secretary of an Ontario corporation called C.C. Holdings.[23] On June 28, 2001, Witnet issued 100,000 shares of common stock to C.C. Holdings.[24] On June 11, 2003, the shares were deposited into account 77XGXF6 at Desjardins Securities.[25] During the month of June 2003, after the publication of the newsletters touting the

---

[18]The company was still known as New Cinema Partners at the time.

[19] According to records provided by Executive Registrar.

[20] According to form 10SB12G/A, as filed with the SEC on October 13, 2000.

[21] According to records provided by Executive Registrar.

[22] According to records provided by Executive Registrar.

[23] According to records provided by Executive Registrar.

[24] According to records provided by Executive Registrar.

[25] According to records provided by Executive Registrar.

stock, Desjardins Securities sold 987,500 shares of Witnet without purchasing a single share.[26]

**THE OFFENSES**

15 U.S.C. Section 78(j)b and 78ff – Securities Fraud

> It shall be unlawful for any person, directly or indirectly . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations . . . prescribe[d] as necessary or appropriate in the public interest or for the protection of investors. Any person who willfully violates any provision . . . shall be fined . . . or imprisoned not more than 20 years, or both.

18 U.S.C. Section 1341 -- Mail Fraud

> Whoever, having devised . . . any scheme . . . for obtaining money . . . by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or . . . any private or commercial interstate carrier . . . shall be fined under this title or imprisoned not more than 20 years, or both. If the violation . . . affects a financial institution, such person shall be fined. . . or imprisoned not more than 30 years, or both.

18 U.S.C. Section 1343 -- Fraud by Wire

> Whoever, having devised . . . any scheme . . . for obtaining money . . . by means of false or fraudulent pretenses, representations, or promises, transmits . . . by means of wire, radio, or television communication . . . any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme . . . shall be fined under this title or imprisoned not more than 20 years, or both. If the violation . . . affects a financial institution, such person shall be fined . . . or imprisoned not more than 30 years, or both.

18 U.S.C. Section 1348 -- Securities Fraud

> Whoever knowingly executes . . . a scheme . . . to defraud any person in connection with any security . . . or . . . to obtain, by means of false or fraudulent pretenses, representations, or promises, any money . . . in connection with the purchase or sale of any security . . . shall be . . . imprisoned not more than 25 years.

---

[26] According to records provided by CPAG.

18 U.S.C. Section 1956 (a)(2) & (h) -- Laundering of Monetary Instruments

> Whoever transports, transmits, or transfers . . . funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity; or . . . knowing that the . . . funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to . . . imprisonment for not more than twenty years . . . Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C. Section 1957 -- Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity

> (a) Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished . . .[to] a fine . . . or imprisonment for not more than ten years or both.

**PERSONS INVOLVED**

| | |
|---|---|
| Name: | **COMMISSO, COSIMO** |
| Date of Birth: | February 3, 1945 |
| Citizenship: | Canada |
| Race: | White |
| Sex: | Male |
| Social Security Number: | Unknown |
| Address: | 23 Riverside Boulevard<br>Thornhill, Ontario<br>Canada |

| | |
|---|---|
| Name: | **CSURGO, JULIUS** |
| Date of Birth: | Unknown |
| Citizenship: | Believed to be Canadian |
| Race: | Unknown |
| Sex: | Male |
| Social Security Number: | Unknown |
| Address: | 160 Frederick Street<br>Suite 906<br>Toronto, Ontario M5A 4H9 |

| | |
|---|---|
| | Canada |
| Name: | **FREIBERG, IRVING** |
| Date of Birth: | April 12, 1957 |
| Citizenship: | United States |
| Race: | White |
| Sex: | Male |
| Social Security Number: | 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 |
| Address: | 18559 Long Lake Drive<br>Boca Raton, Florida<br>U.S.A. |
| Name: | **SPORN, MARC S.** |
| Date of Birth: | November 10, 1962 |
| Citizenship: | United States |
| Race: | White |
| Sex: | Male |
| Social Security Number: | 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 |
| Address: | 945 Banyan Drive<br>Delray Beach, Florida<br>U.S.A. |
| Name: | **SULLIVAN, RHONDA** |
| Date of Birth: | Unknown |
| Citizenship: | Unknown |
| Race: | Unknown |
| Sex: | Female |
| Social Security Number: | Unknown |
| Address | Unknown |

**ENTITIES INVOLVED**

| | |
|---|---|
| Name: | **1345519 ONTARIO CORP.** |
| Place of Incorporation: | Ontario, Canada |
| Address | Unknown |
| Name: | **C.C. HOLDINGS** |
| Place of Incorporation: | Ontario, Canada |
| Address: | 125 Weldrick Road West<br>Apartment 21<br>Richmond Hill, Ontario L4C 3V2<br>Canada |

Name: **EASTERN CONSULTING CORPORATION**
Place of Incorporation: Florida, U.S.A.
Address: 19467 Saturnia Lakes Dr.
Boca Raton, Florida 33498

Name: **WITNET INTERNATIONAL**
Place of Incorporation: Nevada
Address: Suite 404, 357 Bay Street
Toronto, Ontario M5H 2T7

**DOCUMENTS NEEDED**

1. Please obtain and provide copies of records in the possession of Desjardins Securities, Inc., 145 King Street West, Suite 2750, Toronto, Ontario M5H 1J8, or 2 Complexe Desjardins, East Tower, Basilaire 1, Office #311, Montreal, Quebec H5B 1J2, Canada, from January 1, 1999, to December 31, 2003, pertaining to:

(a) account 77XGXF6; and

(b) accounts in the name of C.C. Holdings;

including periodic account statements; account applications and signature cards; order tickets; trade confirmations; deposit and withdrawal items (including copies of canceled checks); debit and credit memoranda; records of wire transfers of funds or securities into or from the accounts; trust agreements and power of attorney forms; and memoranda and correspondence relating to the accounts.

2. Please also obtain and provide copies of the following records from Desjardins Securities:

For the time period January 1, 1999, to December 31, 2003, provide trading data (known as Blue Sheets in the industry), broken down and printed out by introducing firm, relating to the trading of Witnet International, Incorporated, formerly known as New Cinema Partners. The data should include the following:

(a) the name of the security;

(b) the firm's position at the beginning of the requested period;

(c) the trade date and settlement date;

(d) the number of shares bought, sold, or sold short;

(e) the price;

(f) the account for which the security was purchased or sold (i.e. for the firm account or the name of the broker/dealer or the customer name and address if for a customer account);

(g) the registered representative's firm number or initials; and

(h) the party on the opposite side of the trade. (see f)

3. Please provide copies of records in the possession of Research Capital Corporation, Ernst & Young Tower TD Centre, 222 Bay Street, Suite 1500, Toronto, Ontario M5K 1J5, Canada, from January 1, 1999, to December 31, 2003, pertaining to:

(a) 1345519 Ontario Corporation; and

(b) accounts in the name of Rhonda Sullivan;

including periodic account statements; account applications and signature cards; order tickets; trade confirmations; deposit and withdrawal items (including copies of canceled checks); debit and credit memoranda; records of wire transfers of funds or securities into or from the accounts; trust agreements and power of attorney forms; and memoranda and correspondence relating to the accounts.

4. Please also obtain and provide copies of the following records from Research Capital Corporation:

For the time period January 1, 1999, to December 31, 2003, provide trading data (known as Blue Sheets in the industry), broken down and printed out by introducing firm, relating to the trading of Witnet International, Incorporated, formerly known as New Cinema Partners. The data should include at a minimum the following:

(a) the name of the security;

(b) the firm's position at the beginning of the requested period;

(c) the trade date and settlement date;

(d) the number of shares bought, sold, or sold short;

(e) the price;

(f) the account for whom the security was purchased or sold (i.e. for the firm account or the name of the broker/dealer or the customer name and address if for a customer account);

(g) the registered representative's firm number or initials; and

(h) the party on the opposite side of the trade. (see f)

**PROCEDURES TO BE FOLLOWED**

Under United States law, foreign business records are usually admitted into evidence in a proceeding in the United States after the party offering them proves, through the testimony at trial of a qualified witness, that:

1. the records produced are true and accurate copies of original records in the custody of the business;

2. the business made or kept the originals in the ordinary course of business and as a regular business practice; and

3. the originals were made, at or near the time of the occurrence of the transactions they record, by a person who either had knowledge of those transactions or received the information from a person with such knowledge.

The testimony of a qualified witness is generally unnecessary at trial in the United States where that witness provides a written declaration in a foreign jurisdiction that: (1) contains essentially the same information noted in items 1-3 above; and (2) subjects the witness to penalties under the laws of the foreign jurisdiction if the declaration is false.

Please require each official producing records to:

1. produce original or true copies in accordance with Article XII of the Treaty;

2. complete and sign a Certificate of Authenticity of Business Records (form attached) in accordance with Article XIV of the Treaty;

3. attach the completed certificate to the corresponding records produced by that business representative; and

4. present the records with certificate to the Canadian authority executing this request for transmission to the Office of International Affairs.

**CONTACT INFORMATION**

Please contact Office of International Affairs Trial Attorney Daniel Schneider at 202-514-0012 should you have any questions concerning this request.

July 23, 2008
Date

Randy Toledo
Randy Toledo
Acting Deputy Director
Office of International Affairs

Certificate of Authenticity of
Foreign Business Records
[18 U.S.C. 3505]

1. I, ________________, make the following declaration with the understanding that I am subject to criminal penalty under the laws of ___________ for any intentionally false statement herein.

2. I am employed by _____________ [name of employer] which is ________________________________ [describe type of business or organization].

I am employed as ________________ [title]. I am authorized and qualified to make this declaration by reason of my employment.

3. I certify that the documents attached hereto are original or true copies of records which:

(A) Were made, at or near the time of the occurrence of the matters set forth herein, by (or from information transmitted by) a person with knowledge of those matters;

(B) Were kept in the course of a regularly conducted business activity;

(C) Were made by the said business activity as a regular practice; and

(D) With respect to any copies attached hereto, were made from the original or from duplicates of the original.

4. The originals or duplicates of these records are maintained in ________________________ [country].

Date of Execution: ________________________________

Place of Execution: ________________________________

Signature: ________________________________